Hartford Bridge Company *v.* Union Ferry Company.

HARTFORD BRIDGE COMPANY *vs.* UNION FERRY COMPANY.

The Hartford Bridge Company was incorporated in 1808, with power to erect and maintain a toll bridge across the Connecticut river, between Hartford and East Hartford. There were at this time two legally established ferries between these towns, and belonging to the towns, located below the proposed site of the bridge, and within a quarter of a mile of it. In 1818, the bridge, which had been erected soon after the incorporation of the company, having been greatly damaged by a flood, and requiring to be rebuilt, and the company being unwilling to incur the expense of rebuilding it without the grant of further privileges, the legislature passed a resolution that, upon the bridge being rebuilt to the acceptance of a committee appointed for the purpose, *the ferries by law established between the towns of Hartford and East Hartford should be discontinued, and said towns should never thereafter be permitted to transport passengers across said river;* with a provision that if the company should neglect to maintain the bridge, the towns might open the ferries. In 1857, the legislature incorporated the Union Ferry Company, with power to establish a ferry across the Connecticut river, between the towns of Hartford and East Hartford, at a point not less than a mile below the bridge, but made no provision in the charter for compensation to the bridge company for the injury to its franchise. The ferry company immediately after established the ferry, at a point a mile and a half below the bridge, and were using it for the conveyance of passengers, and a considerable amount of tolls was thereby diverted from the bridge. The line of travel was not the same with that accommodated by the bridge, and the growth of the city of Hartford in that direction had been such as to require the accommodation. On a bill in equity brought by the bridge company, to restrain the ferry company from the use of the ferry, it was held that the resolution of 1818 was to be construed as a contract on the part of the legislature, only that the then existing ferries should be discontinued, and that the towns should not be allowed to revive them; and that the resolution of 1857, establishing the Union ferry, was not a violation of the contract, and was not unconstitutional. [Storrs, C. J. dissenting.]

The same general rules of construction are to be applied to both public and private grants. The intent of the contract is to be ascertained by a fair and rational interpretation of the language used, and when the intent is ascertained, it is to be carried out against the state as fully as against an individual.

Where, however, the language of a public grant will equally admit of two constructions, so that the intent can not be ascertained, then that construction is to be adopted which is most favorable to the state. This is but the application of the ordinary rule that the language of a contract shall be taken most strongly against the party using it, the language of a public grant being regarded as the language of the party obtaining it.

In the present case, the contract of the state that the ferries then existing should be discontinued and never afterwards revived, should be construed as meaning that no ferries substantially the same, and accommodating the same line of travel, should be established.

Remarks on the history of legislation in this state on the subject of ferries.

Before an act of the legislature should be declared unconstitutional by the courts, its repugnance to the provisions or necessary implications of the constitution should be clear and beyond all reasonable doubt.

BILL in equity for an injunction against the use of a ferry by the respondents.

The Hartford Bridge Company was incorporated by the General Assembly of this state, in the year 1808, and immediately thereafter, under the power conferred by its charter, constructed a toll bridge across the Connecticut river, at the city of Hartford, and a causeway from the east end of the bridge, through the East Hartford meadows, to the village of East Hartford, expending in the construction of the bridge and causeway more than $96,000. The grant was not exclusive, and it was expressly provided in the charter that nothing in the grant should then, or at any future time, impair the right to keep up the ferries established by law between the towns of Hartford and East Hartford. There were then, and had long been, in existence, two ferries between these towns, belonging to the towns, which, if not originally established by law, had been long recognized as legally established ferries, and which were located below the bridge, and less than a quarter of a mile from it, between certain definite points on the banks of the river. In March, 1818, the bridge was so injured by a flood that it became impassable, and had to be rebuilt, and the General Assembly, at its session in May of that year, passed a resolution in aid of the company, the important part of which, with reference to the present suit, is the following :—" Whenever said Bridge Company shall have repaired said bridge, and shall have raised and repaired said causeway, to the acceptance of the commissioners appointed by the original grant, the ferries by law established between the towns of Hartford and East Hartford shall be discontinued, and said towns shall never thereafter be permitted to transport passengers across said river, unless on the happening of the contingency hereinafter mentioned." The contingency here referred to was the neglect of the company to repair the bridge and causeway to the acceptance of the commissioners, within such time as they should limit for repairing

them, if they should at any future time get out of repair; which contingency the court found had never happened. The original charter contained a provision that whenever the tolls collected by the company should have reimbursed to them the sums expended in constructing and maintaining the bridge and causeway, with twelve per cent. interest thereon, the bridge and causeway and rates of toll should be subject to such regulations and orders as the General Assembly should think proper to make. The company, down to the time of the institution of the present suit, had in fact received but about six per cent. of interest upon the sums thus expended by them. The charter also contained a provision that the grant might receive such alterations, from time to time, by the General Assembly, as experience should evince to be necessary or expedient; and the resolution of 1818 contained a provision that that resolution might at any time thereafter be altered, amended or repealed by the general assembly, in the same manner as the original act incorporating the company.

The respondents were incorporated by the General Assembly in the year 1857, by the name of the Union Ferry Company, with power to establish and use a ferry across the Connecticut river, for the transportation of passengers and goods between the towns of Hartford and East Hartford, at any place not less than a mile below the bridge and within a certain limit named. They soon after established their ferry at a point a mile and a half below the bridge and commenced running boats across the river, and had since received and were still receiving a large amount of ferriage. The tolls of the bridge were materially diminished by reason of the business withdrawn from it by the ferry. The rates of toll charged at the ferry were the same as those at the bridge. By reason of the increase of population in the south part of Hartford, the ferry had become quite convenient to the public, and especially so to persons residing in Glastenbury and in the south parts of Hartford and East Hartford. The act incorporating the respondents was passed by the General Assembly without the consent of the bridge company, and without notice to them. It contained no provision for com-

pensation to the bridge company, and no damages had been paid them by the respondents.

On these facts the petitioners sought for an injunction against the use of the ferry by the respondents, claiming that the act of the General Assembly establishing the ferry was in violation of their charter and void, and that if the General Assembly had power to establish the ferry, it could be done only upon compensation being made to them.    The facts were found by the superior court, and the case reserved for the advice of this court.

*Baldwin* and *F. Parsons,* for the petitioners.

1. The general rules of construction applicable to the grants of states do not differ from those applicable to other contracts. Such grants shall have a liberal and favorable construction for the sustaining of them.    The rule that such a grant is to be construed favorably for the state, is one of little importance and of infrequent application, as it is not to be resorted to unless other rules of interpretation fail.    It is never to be applied to defeat a grant, but only to limit it, and never except where there is a real doubt as to which of two interpretations to adopt and either may be adopted without impairing the apparent object of the grant.    The rule is made in every instance to bend to the real justice of the case.    2 Parsons on Cont., 18, and note *k.*    *Willion* v. *Berkley,* Plowd., 243.    Coke 2 Inst., 496.    *Jackson* v. *Reeves,* 3 Caines, 293.    *Huidekoper's Lessee* v. *Douglass,* 3 Cranch, 70.    Remarks of Curtis, J., 13 How., 81.    Judge Church applies this rule, in this manner and to this charter, in his opinion in the case of the *Hartford Bridge Company* v. *East Hartford,* 16 Conn., 173.

2. If then the construction is to be such as to sustain the object of the grant, let us next inquire what is that object. The General Assembly, in 1818, found that the bridge erected in 1808 had been in great part carried away and required to be rebuilt.    They found the company exhausted of its funds, and unwilling to raise the additional money necessary to rebuild the bridge unless they could be secured in the full enjoyment of the rights conferred.    Large improvements were

also required in addition to the mere reconstruction of the bridge. A new arrangement was then proposed by the General Assembly, by which, if the bridge was rebuilt and the improvements made, the company was to be secured against the competition of the ferries, and an additional franchise, not enjoyed before, was granted—the exclusive right to tolls from passengers across the river. We are to look at the words of the grant in connection with the existing facts, and the conditions and relations of the subject matter. Church, J., says, (*East Hartford* v. *Hartford Bridge Co.*, 17 Conn., 92,) " The obvious purpose of this enactment was to enlarge the franchise of the bridge company, and to secure to it the exclusive right to transport passengers across the river at the bridge and to receive the tolls therefor." The company was not standing, in the view of the court, on its common law right to sue any body who by establishing a ferry should be guilty of a disturbance. The court do not allude to this right, but place the case wholly on the resolution of 1818. They regarded that resolution as enlarging the franchise and making it exclusive. Here we have, then, an authoritative exposition of the object which the legislature had in view in passing that resolution and the company in accepting it.

3. The object being thus discovered and determined, it is now for this court to give the grant such a construction as will effectually carry out that object, if the language is susceptible of such a construction. The court will feel bound to see that the purpose does not fail by reason of a different construction being given from that which the parties originally intended. The clause which is to be construed is as follows :—" The ferries by law established between the towns of Hartford and East Hartford shall be discontinued, and said towns shall never thereafter be permitted to transport passengers across said river." It is admitted that this prohibition is absolute upon the towns, but it is said that the legislature had the power at once to authorize any other corporation or person to establish a ferry. If so, the legislature could, the very next year, have incorporated the selectmen of the two towns with power to establish a ferry ; but this would be clearly a violation of the pledge of

the legislature. The ferry is the ferry of the government, whoever is empowered to keep it up. This same Union ferry is a government ferry. The respondents are merely another agency employed by the government, in the place of the towns, to maintain the ferry. The towns are mere municipal corporations, formed for the purpose of performing more conveniently duties which pertain to the sovereign power for the public weal. And not only are these duties performed more conveniently by the towns, but it is thought right that the local communities should bear burdens of which the benefits are also in great measure local. Towns have always been charged with the duty, not merely of making highways, but of keeping up ferries. Often they are mere burdens, perhaps always so at their commencement, but they may ultimately become valuable as property. The legislature is the sole judge whether it will itself construct these improvements at the general charge, or impose the burden in whole or in part on the towns. Thus it has been common for the legislature, in chartering a turnpike company, to compel the towns to pay for the right of way, imposing on the company only the making of the road, and allowing them the tolls, the towns being compensated by the local advantages. So it was competent for the legislature to take away this power from the town of Hartford, as its contribution towards the burden of the bridge, which was a benefit to the locality. The history of the legislation on such subjects is given, more fully than elsewhere, in the opinion of the court in the case of *Enfield Bridge Co.* v. *Hartford & New Haven R. R. Co.*, 17 Conn., 63. The towns, then, in making and maintaining highways and ferries, are to be regarded as acting as public functionaries of the state. If this be so, then when the legislature contracts with the bridge company that the towns shall never establish a ferry, it has agreed that no ferry shall be established; that it will not itself, in the exercise of its sovereign power, authorize the establishment of any ferry. In thus restricting its power, there was of course reserved the right to take away or impair the franchise of the bridge company, thus extended by the act of 1818, upon making compensation to the company; and in the present case, the resolve establishing

the Union ferry might be a valid one, if provision had been made for compensation to the bridge company for the injury to its franchise. No such provision is made, and the court should not hesitate to set aside an act of the legislature so clearly in violation of its contract. It should be regarded as improvident legislation. It is one of the highest duties of the court to protect the rights of parties against such legislation.

*T. C. Perkins* and *Hubbard,* for the respondents.

The question in this case is, whether the act of 1857, estabing the Union ferry, is unconstitutional and void. We admit that it is so if it impairs the obligations of the contract of the legislature with the bridge company by the act of 1818. That act we may admit to be a contract which the legislature can not impair. The prerogative which the court possesses, of declaring an act of the legislature void, is one which it always exercises reluctantly, and never except in the clearest case of unconstitutional legislation. *Commonwealth* v. *Knee-land*, 20 Pick., 227. The general principle with regard to the effect of a legislative grant upon the future power of the legislature over the same subject matter, is now well settled by a long series of adjudged cases. A simple, unrestricted grant of a franchise confers an indefeasible right to do the specific act or exercise the specific power expressly authorized in the grant, and nothing more. Everything beyond this is reserved to the legislature for the benefit of the public, and in such a case the legislature may confer a similar franchise on a similar corporation, materially interfering with the profits and utility of the former franchise. The essential destruction of a former franchise for all beneficial purposes is no sufficient objection to the validity of the subsequent grant. *Charles River Bridge* v. *Warren Bridge,* 11 Pet., 543. *White River Turnpike Co.* v. *Vermont Cent. R. R. Co.*, 21 Verm., 590. *Washington & Baltimore Turnpike Co.* v. *Baltimore & Ohio R. R. Co.*, 10 Gill & J., 392. *Matter of Hamilton Avenue,* 14 Barb., 405. *Shorter* v. *Smith,* 9 Geo., 523. *Bush* v. *Peru Bridge Co.*, 3 Ind., 21. *Collins* v. *Sherman,* 31 Miss., 697. *Salem & Hamburgh Turnpike Co.* v. *Lyme,* 18 Conn., 451. *Richmond R.*

*R. Co.* v. *Louisa R. R. Co.*, 13 How., 81.  *Fanning* v. *Gregoire*, 16 id., 524.  *Lansing* v. *Smith*, 4 Wend., 9.  *Penn. R. R. Co.* v. *Canal Commissioners*, 21 Penn. S. R., 9.  To apply this rule to the case at bar, the bridge company has an exclusive right to the enjoyment of its franchise, but that right does not extend to the exclusion of rival corporations located elsewhere on the Connecticut river, unless it is so " written in the bond." Is it then so written in the bond? Have the legislature conveyed to the bridge company by its charter, an unlimited monopoly over this common highway of the people, at this its most important point? That such a monopoly is conveyed in express terms will not be pretended. The claim is that the right is conveyed by implication.  Now to determine whether such a right is to be implied from the language of the grant, we must ascertain the rules of construction by which the judicial mind is accustomed to govern itself, when it is inquiring after a grant of a monopoly not given in express terms.  And upon this point we say:—1st. That all such grants are to be construed with the utmost strictness and jealousy as against the corporation.  A grant of a monopoly is odious in the eyes of the law making power, and therefore should never be inferred in a legislative grant when not plainly expressed.  And it is equally odious, in modern times, in the eyes of the courts.  It is regarded as " an act of improvident legislation."  *Washington Bridge Co.* v. *The State*, 18 Conn., 65.  The judicial mind will therefore struggle against a construction which involves the creation of a monopoly.  Further, the charters of private corporations are usually drawn by their attorneys.  The language is insidiously, sometimes fraudulently, employed.  They are enacted by the legislature with but little scrutiny.  It is therefore but fair to require a party claiming a monopoly to show that he has acquired it with full knowledge and consent of the legislature, and in direct terms, and not by artful or uncertain implications.  2d. A monopoly is held never to be conferred by implication, or, if so, only when the implication is unavoidable.  *Charles River Bridge* v. *Warren Bridge*, 11 Pet., 544, *et seq.*  *Penn. R. R. Co.* v. *Canal Commissioners*,

21 Penn. S. R., 9. *Lansing* v. *Smith,* 4 Wend., 9. *Collins* v. *Sherman,* 31 Miss., 697. Sedgwick on Const. & Stat. Law, 338. *Bradley* v. *New York & New Haven R. R. Co.,* 21 Conn., 294.

But, in the next place, if we are to resort to implication, can the grant of an exclusive monopoly be inferred from the language of the plaintiffs' charter? Such an implication is supposed to be contained in that part of the charter of 1818 which suppresses the old ferry between Hartford and East Hartford. Is such an implication justified by the language of the act? 1st. The ferries thus suppressed were in operation under the eaves, almost, of the bridge. They took the plaintiffs' line of travel from their very causeways. 2d. Being located close beside the bridge, they did not shorten the distance of travel to and from the city, and furnished no additional facilities or accommodations to the public. 3d. The charter provides that " *the ferries by law established between the towns of Hartford and East Hartford* " shall be discontinued; referring to the old ferries located at the foot of Ferry street, and to none other. It is therefore submitted that the legislature only stipulated that the *then existing ferries,* which accommodated no one, and served only as a kind of shunpike to the bridge, should be discontinued. If it was intended to provide that no ferries should ever thereafter be established on Connecticut river which should diminish the revenues of the bridge company, why is it not so expressed in the charter?

But it may be said that the clause above referred to provides that the *towns* of Hartford and East Hartford shall not be permitted to transport passengers across Connecticut river. To this we answer:—1st. This may be regarded as a draftsman's circumlocution for the same idea before expressed. 2d. If it has any special and independent significance, it was merely intended to protect the bridge company against ferries to be operated by the two towns above named, for the special benefit of their own inhabitants, and where there would be every motive to reduce tolls to the mere point of paying running expenses and perhaps ultimately of establishing free fer-

ries at the joint expense of both towns. 3d. But it is to be specially observed that the towns of Hartford and East Hartford are prohibited, and they only. From this prohibition of these two towns the plaintiffs infer that all other corporations and persons are prohibited. The answer to this claim is quite obvious. If the legislature had intended to deprive themselves of all right in the future to establish other rival crossings they would have said so.

In the third place, the plaintiffs base their claim upon that clause of their charter which provides that the grant shall be irrevocable until the capital of the company shall be reimbursed with 12 per cent. interest. Upon this point we remark:—1st. That this clause was intended to limit the time during which the charter should remain irrepealable. It performs no other office in the language of the grant. If the clause had not been inserted, the grant would, under the decision of the courts, have been perpetual. 2d. That a clause intended to limit the term of a monopoly can not be used to enlarge the scope of it.

But to all these claims that an exclusive monopoly has been conferred on the bridge company by implication, we reply:— 1st. That if the legislature had intended to surrender so important part of its sovereignty it would have said so, and said so in apt and intelligible words, and not in blind and circuitous expressions. 2d. It would have defined the limits of the monopoly. If the plaintiffs have the exclusive right which they claim, how far does it extend? how far up and down the river? Does it extend to the exclusion of any other similar grant impairing the revenues of the plaintiffs? The legislature would never have granted an exclusive right of so indefinite extent. 3d. When the legislature has intended to confer an exclusive monopoly, it has been careful to express that intent in plain language, and to define with precision the limits of the monopoly. *Charter of Enfield Bridge Company*, 1 Priv. Acts, 250. *Charter of Washington Bridge Company*, 1 Priv. Acts, 290, 292. From all these considerations it is evident that the state has only contracted with the plaintiffs to suppress certain competing old ferries, located almost under the

shadow of the bridge and useless to the public, and to protect them against competition from the towns of Hartford and East Hartford, and nothing more. This obligation the state is bound to perform. Every thing beyond this is reserved to the future discretion of the legislature. Beyond this the plaintiffs, like other corporations, must trust to the good faith and honor of the sovereign power. Better that a private corporate monopoly should trust in part to the magnanimity of the state, than that the state should trust in whole to the magnanimity of a private monopoly.

ELLSWORTH, J. We have held this cause a long time under consideration, it being one of great pecuniary interest to the parties, and involving a question of much public interest.

The question grows out of the construction of the resolve of the General Assembly, passed in 1818, for the benefit of the Hartford Bridge Company. It is in the following words :— "That whenever the bridge company shall have repaired said bridge without a draw, and shall have raised and repaired the causeway, to the acceptance of the commissioners appointed by the original grant, the ferries by law established between the towns of Hartford and East Hartford shall be discontinued; and said towns shall thereafter never be permitted to transport passengers across said river, unless on the happening of the contingencies hereinafter mentioned."

The occasion of this resolve was this. The petitioners, soon after their incorporation in 1808, had erected a bridge at the place of the present one, which they continued to enjoy until 1818, when it was carried away by the freshet, or so greatly injured that it became necessary to rebuild it. The General Assembly at their session of that year, provided that in rebuilding the bridge certain alterations should be made therein, and that the causeway through East Hartford meadows should be raised, and some further expenses incurred by the company, in consideration of which the Assembly passed the resolution above recited. The ferries were located a few rods south of the bridge, and up to this date, (1818,) had not been discontinued.

Hartford Bridge Company *v.* Union Ferry Company.

It was decided by this court, in the case of the present plaintiffs against the town of East Hartford, reported in 16 Conn. R. 149, that the resolution in question must be held to be an enlargement of the original charter of the company, and that it is *irrevocable* until the company shall have received a certain remuneration by their tolls, which remuneration has not yet been realized.

In 1859 the Union Ferry Company was incorporated, and empowered to establish a ferry across Connecticut river, about one and a half miles south of the bridge, and some two miles north of the south line of Hartford and East Hartford. This ferry they have established and are now using, and it is to prevent the continuance of it by a perpetual injunction that the present bill is brought. The petitioners insist that the legislature can not authorize the establishment of a ferry at any point on the river, within the limits of Hartford and East Hartford, without first making them an adequate compensation. These limits are about five miles north and south. This the petitioners deny. They insist that the legislature have not, by the resolve of 1818, restricted themselves to any such extent.

Much has been said in the course of the argument as to the rule of law which should govern the court in putting a construction upon grants and charters by the legislature. The respondents contend that courts are bound to construe them with great strictness, a strictness akin to that with which courts construe penal statutes; that is, that nothing shall be held to pass to the grantee by implication, nothing beyond the very word and letter of the grant, although the understanding of the parties be most apparent, and although in any other case the instrument would be held to convey the thing intended; and some cases have been read in which judges have expressed themselves somewhat in this manner. But we doubt very much the propriety of any such general rule of law. We know not why such stringency is to be applied to a legislative grant more than to any other grant. In every other case where we look to a contract to learn what are the rights of the parties, we seek to know what the contracting

parties intended by the contract, or what the language and scope of the instrument mean to express; and it is the same whether it is a public or private agreement. In other words: it is our duty to ascertain by a fair, intelligent, and equitable construction of the language made use of, viewed by itself, or in its application to the subject-matter, what is the character and extent of the grant. If the intention is clear or satisfactory, then we are bound to adopt it as the rule prescribed by the parties, and to hold to it as fully against the legislature as against an individual. Any other rule must necessarily be a false one, and must lead to unjust results and consequences. Such is the view taken by Mr. Parsons in his treatise on contracts, (Vol. II, p. 19, note *k*,) and by many of the judges whose remarks are cited by him therein. We feel confident that it can not be the duty of courts, who sit to carry out the agreements of parties, to be curious and subtle in inventing rules to thwart their intentions legally expressed; especially, if the agreements are founded on valuable considerations, as most public grants are. Courts of justice, we repeat, should endeavor to effectuate contracts, whenever they can do it, by a fair and rational construction of the language made use of. To do otherwise, will be to sacrifice the rights of parties, by adhering too rigidly to artificial rules, which are never to be resorted to unless the true meaning can not be learned otherwise. Where this is the case, where grants or instruments are equally susceptible of two constructions, so that one party or the other must suffer, the rule of law undoubtedly is, that such an ambiguity shall not operate to the prejudice of the state, but to the party which has made use of such ambiguous language; for the same reason in part that an ambiguity shall not operate in favor of a private grantor. In both cases the construction is to be against the party whose language is faulty; and public grants and charters are treated as if drawn up by the grantee or recipient of the thing granted. Possibly this is not always the case, and, perhaps, this is not the entire reason of the rule, but whether it is or not, it is conceded to be the rule adopted in private grants, and the exact reverse is

conceded to be the rule in grants by the legislature. Every presumption we allow is to be in favor of the state.

We need not pursue this topic at any greater length; nor will we remark particularly upon the many authorities read on the argument in its elucidation. Ever since the decision of the Charles River Bridge case, in the court of Massachusetts, and afterwards in the Supreme Court of the United States, it has been held to be the settled law throughout the country, that charters are to be construed most favorably for the state. The cases are all one way, and they have accumulated in the several states until our books are filled up with them.

What we have aimed at in these remarks is, not to reargue the question on principle, but to state what we understand the rule of " *contra proferentem* " to be, and when it may be applied to get at the intention of the parties in public or private grants. Were we obliged to apply the rule here, we should of course give the respondents the benefit of it, as under the grant of their ferry they represent the legislature. But we do not feel ourselves driven to this extremity. We believe we can dispose of this case upon principles more equitable and satisfactory.

Let us then take up the resolve of 1818, and see what are its provisions. It consists of two parts; 1st, a suppression of the two ferries " *by law established between the towns of Hartford and East Hartford,*" and 2d, a declaration that "*said towns shall not thereafter transport passengers across the river.*"

If there was nothing here but the first part—the suppression of the ferries—we think it quite clear that these two specific ferries, and what is fairly included in or meant by them, are suppressed, and nothing more. This is the very language made use of, and this language is fully satisfied by a suppression of the exact things mentioned; and when this is the case, no other construction is called for, as possibly the one intended though not expressed. These two ferries were known and recognized, if not originally established, by the law of the state. They were local, definite, and specific, as is every ferry

at this time throughout the river—as much so as a bridge, canal, turnpike or railroad. There are on the river some ten or fifteen ferries, each one of which has its name or description in the public statutes; each has its commissioner, its rate of toll, its kind of boat, whether horse-boat, steam-boat, or scow-boat, its number of ferrymen, its implements for ferrying, its wharves, its places of embarking and landing, and its " post," with a board thereon containing the several fares allowed by law for such ferry, written in large letters, set up at the place where passengers enter the boat; and what is quite important to the identity of the ferry, all public ferries are expressly forbidden unless they be first authorized and established by law. The statute is particular to declare that there shall be no private ferries for passengers between the ferries established and to be kept up by law; nor can any fares be taken for public ferrying but such as are allowed by law. Here, then, we have all the characteristics which enter into the identity of a public ferry; and such a ferry, at common law, is but a portion of the public franchise carved out and allowed to the town or corporation, upon the terms and under the supervision aforesaid. A ferry is defined at common law, to be " a liberty by prescription, or the king's grant, to have a boat for passage upon a river, for carriages, horses, or men, for reasonable toll." Jacob's Law Dict. "*Ferry.*" Burrill's Law Dict. *id.*

Besides, these two ferries are, in the very resolve under consideration, said to be " *the* ferries by law established." When, then, they were suppressed, nothing was suppressed but what belonged to, or was embraced in, these ferries. If more was intended, it was most natural and easy to have said so. It is quite possible nothing more was intended than was expressed. Very likely it was supposed that no other ferry could be established between these towns, considering the character of the meadows on the opposite banks of the river, as indeed was suggested by one of the counsel of the petitioners; or that a new ferry anywhere between these towns would not thereafter be called for as necessary or desirable. But on this point we are not at liberty to speculate. We can only take the resolution

as it is written. Indeed, were we to launch into any such speculation, it is doubtful if we or others should harmonize in our views as to what was anticipated as to other ferries.

Once more, if I do not mistake the views of the court, we admit that the suppression of these ferries is a discontinuance of the ferries, substantially, as understood and used. We do not mean by the term "ferry" a mere naked line, or right to pass from the exact landing on one side of the river to the exact landing place on the other, excluding the right to shift a few feet or rods, the better to accommodate the *same line* or *course* of travel; such variation being nothing more than the travel of a few more feet or rods to enter or leave the ferry boat. The identity of the ferry is still preserved. To this degree, it would seem, we must allow the suppression to be carried, or else nothing is effected of the least conceivable interest to the bridge company. If a new ferry may be set up twenty feet below the old ones, for the same purposes, the suppression amounts to nothing.

And here, it is quite possible, though we have not noticed any such distinction in the books, that there is a difference in this respect between suppressing a franchise and granting one *de novo*. In the latter, it seems now to be well settled everywhere, that the grant of a franchise, as a bridge, canal, turnpike, railroad, or ferry, is a grant of right to construct and use the specific thing granted; and that, unless there be words restricting the legislature, they are at liberty to license other bridges, canals, turnpikes, railroads or ferries, according to the public exigency and their discretion, for it must be presumed that they are of opinion that such a necessity does exist.

Let this point, however, be as it may, we are satisfied that the new ferry here does not come within any such implied restriction. It is not *the* ferry or ferries which were suppressed. It is not so found by the court below, nor in justice could it be upon the facts stated and submitted to us by the judge. The new ferry might very properly have been needed had the old ferries not been suppressed. It accommodated a different line and course of travel, and has become most convenient, if

not necessary, in consequence of a state of things which did not exist in 1818. We believe the old ferries would not fill the place of the new one, nor would the new ferry fill the place of the old ones. The new ferry takes none of the northern travel, and but a small portion of the eastern, to and from the city of Hartford, but to a considerable extent that which has grown up in consequence of changes in the south part of the city, and what would have passed over the ferry between Glastenbury and Wethersfield. Besides, it shortens very greatly the distance to be traveled in passing to and from Hartford, from the south-east part of Hartford county. Undoubtedly the new ferry takes some of the travel which would otherwise pass over the bridge, and perhaps over the old ferries, if they were in use. But this is not the criterion. Any new ferry on the river within several miles would have the same effect.

And further, we can not but think, in looking at the constitutionality of this new ferry, that a good deal must be left to the discretion of the legislature. We ought to assume that they will act fairly and intelligently in the exercise of their constitutional powers, and will not intentionally disregard or transcend them. It is their bounden duty to provide needful and convenient bridges and ferries for the use of the people. In fulfilling their duty, in this instance, they have found the new ferry to be convenient, if not necessary, to a portion of their constituents, and who shall call in question the correctness of their conduct, unless they have exceeded their powers? In their judgment, allow us to repeat, they regard the bridge as insufficient for the reasonable wants of those for whom they legislate; and if this is so, and they are not restricted in providing for those wants, they should, of course, license the new ferry without damages.

While we are bound scupulously to preserve unimpaired the rights of the bridge company, and not yield to the clamor which so frequently is gotten up against corporate rights after large expenditures have been made upon the faith of charters and solemn covenants, we must be equally vigilant and careful of the just rights of the public; and whenever we are con-

vinced that such a right remains to them, we shall neglect our duty if we overlook it, or thwart the design of the legislature in allowing the public to use it. It is however a well settled principle of judicial construction, that before an act of the legislature ought to be declared unconstitutional, its repugnance to the provisions or necessary implications of the constitution should be manifest and free from all reasonable doubt. If its character in this regard be questionable, then comity, and a proper respect for a co-ordinate branch of the government, should determine the matter in favor of the action of the latter.

We come next to a consideration of the second part of the resolve—" *and said towns shall thereafter never be permitted to transport passengers across said river.*"

It has been said that these words, taken in connection with what precedes them, may be considered as declaring or defining the old ferry franchises to be co-extensive with the towns of Hartford and East Hartford, and, therefore, that the suppression of the ferries virtually extinguishes the entire franchise, or removes it beyond the power of the legislature unless damages are given. This construction we can not sanction. It is unnatural and constrained; and, besides, it is not called for. For the reasons already stated, the old ferries were definite, specific and local. Hence we can not allow that, by mere inference, they are to be changed in all the characteristics which give them identity, especially as the resolve provides that in case of neglect by the bridge company to keep the bridge and causeway in repair, the said ferries shall revive and may be used as before, restoring nothing but what had before been taken away. Besides, there are other interpretations much more sensible and obvious which we should prefer to adopt. We are much inclined to believe that these words are but a circumlocution of the same idea before expressed, that these ferries shall be stopped, and these towns (who alone owned them) shall not open them again for public use. This is the most intelligent construction of the words, and it is one that satisfies the scope and import of the language made use of. We do not know that any more than this was sup-

posed or understood by these words of restriction in favor of the bridge company. Nor can we say, if more than this had been asked for, that the people would have consented to the legislature's granting it. It is not altogether unworthy of notice, that no suppression of the ferries was asked for or enjoyed during the continuance of the first bridge from 1808 to 1818. And we can well imagine that it might not have been easy to induce the legislature, understandingly, to tie up their hands for all time as to new and different ferries at other places in the towns, whatever might be their growth or the extent of their business or their relations to the other towns and the public generally. It might possibly have been intended, but, under the circumstances, we think it would have been an extraordinary stretch of legislative action, and should not be presumed, when it could have been clearly expressed if intended.

In order to reach the conclusion to which we have come, we do not find it necessary to look out of the resolve itself; much less to call in aid the rule " *contra proferentem,*" which latter, if applied, would undoubtedly decide the question at once for the respondents.

We will next look at the words by themselves, and see if this will help the petitioners' claim. It has been most strenuously urged that they amount to a covenant that neither the towns of Hartford and East Hartford, nor any person or persons whatever, shall thereafter carry passengers across the river within the limits of the two towns. Certainly the words are not apt or appropriate to express any such covenant. And if such was the intention of the legislature, nothing could have been more easy than to have expressed it; and we must think it would not have been omitted. This very legislature had their attention called to this distinction, for in the charter of the Washington Bridge Company, passed in 1818, they declared, after suppressing the ferry in that case, " that no person shall erect or establish any ferry across said river (the Housatonic) at any place below the ferry of Oronoque." So in the charter of the Enfield Bridge Company, in 1798, in order to guard the grant in that case from competition, the

legislature provided that " no person or persons shall have liberty to erect another bridge anywhere between the north line of Enfield and the south line of Windsor." The absence, then, of kindred words in this resolution, is a very strong argument in the respondents' favor, that nothing of the kind was intended.

It may be well, perhaps, at this place, to inquire briefly into the nature and history of ferries on this river, as such inquiry may aid us somewhat in our investigation. Very little is to be learned from the records of the General Assembly. We find in our earliest statutes, and the same is true of the present statutes, that towns were required to keep and maintain such ferries as " have been or shall be established by law ; " and it is further declared that there shall be no public ferries besides those which are so established. Accordingly, from time to time, ferries have been established on this river by the legislature ; and to this day, each ferry is known by its name or description in the law which created it. Each one is located, fixed and defined, and is placed under the control of a commissioner appointed by the legislature. Ferries have been not only created, but have been modified and suppressed, at the pleasure of the legislature, like public highways, which in fact they are. Each one is confined to such tolls, and subject to such regulations, as are prescribed by the statute. It appears to us from all we can learn on the subject, that ferries were at first, as many of them still are, considered and treated as burthens or duties imposed on towns by the legislature for the benefit of public travel ; but the early history of ferries in this state is so obscure that we know nothing of some of them but that they have become and are now held to be the property of individuals or of towns, or perhaps rather in the nature of property whose ownership rests upon immemorial usage or prescription, if it be proper to use that word in relation to a practice begun and continued as a duty. This is substantially the view taken of ferries by this court, and by the supreme court of the United States, in the case of the present plaintiffs against the town of East Hartford, reported in 16 Conn., 149, 17 id., 79, and 10 Howard, 511. See further, *Adams* v.

*Pease,* 2 Conn., 480, *Enfield Toll Bridge Co.* v. *Hartford & New Haven R. R. Co.,* 17 id., 60, *Aiken* v. *Western R. R. Corporation,* 20 N. York, 370, and Hargrave's Law Tracts, ch. 3, pp. 8, 9.

Bridges ever have been, and still are, as is obvious we think from the statute book, considered to be public local burthens. We find towns are obliged to make and maintain them as much as highways, and it is just, because they are highways or parts of highways, that the expense of making and maintaining them is cast upon the towns. Where a stream divides towns, bridges are to be maintained at their joint expense. The same is true of ferries, only they are to be first established by law. The Connecticut river is a great natural highway, and has always been treated as such, whether passed over in the line of the stream or across it, and this highway, like every other public franchise, belongs to and is vested in the state, to be regulated for the benefit of all the people, and it can not be appropriated to an exclusive use but by the consent of the legislature. See *Aiken* v. *Western R. R. Corporation,* supra.

The general power of the legislature over streams and rivers within their limits, as natural highways for general use, is not and can not be denied by any intelligent jurist. If any one wishes to learn what is the settled doctrine of the common law, and on what grounds it rests, we refer to the cases already cited, and to some few more of the many to be found in the books. *Palmer* v. *Mulligan,* 3 Caines, 314; *Hooker* v. *Cummings,* 20 Johns., 100; *Canal Commissioners* v. *The People,* 5 Wend., 444; and *Commonwealth* v. *Charlestown,* 1 Pick., 180, 188. In the Enfield bridge case, *supra,* Williams, C. J., in giving the opinion of the court says, (17 Conn., 64,) that ferries and bridges have been ordinarily provided and regulated by law, here and elsewhere; and he cites numerous authorities to sustain this position. He further says that "it is a well-settled principle of common law, that no man may set up a ferry for all passengers, without prescription time out of mind, or a charter from the king, because it doth in consequence tend to a common charge, and is become a thing of

public interest and use, and every ferry ought to be *under a public regulation.*" Judge McLean, in *Bouman's Devisees* v. *Wathen,* (2 McLean, 383,) says:—" And for this accommodation of the public, government is not only authorized but bound to make suitable provision." It is on this ground that ferries are licensed in behalf of individuals and corporations upon the terms stipulated in the grant. If then it is the duty of the government to provide ferries and bridges and regulate them, it must follow that an individual without license can not establish a ferry or a bridge ; and as to ferries particularly, there is a positive prohibition against their establishment without special license in this state. Rev. Stat., tit. 16, § 5.

In this view, it is obvious that the towns of Hartford and East Hartford have never had a right to maintain a public ferry except at the two old ferry places, where we suppose they did acquire a right by usage or prescription ; and therefore they could not complain if other ferries were set up by the legislature at other places ; nor can the bridge company complain, so long as the old ferries remain suppressed, and no other ferry is allowed which is substantially the same with them. If the last clause of the resolve means anything more than that the towns of Hartford and East Hartford shall not use or enjoy the old ferries, we do not know what that meaning is ;. for certainly nothing more was taken from them by suppressing the ferries. The duty of the legislature, as to the remainder of the general franchise, continued as before, under the limitations already specified ; and, saving that limitation, they may declare how and when it may be used by a different and distinct ferry.

The prayer of the bill must be denied.

In this opinion HINMAN and SANFORD, Js., concurred. STORRS, C. J., dissented.

Advice that bill be dismissed.